**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., Plaintiffs,**

**v.**

**PARK–OHIO INDUSTRIES, INC., et al., Defendants.**

**Civ. A. No. C 85–1761.**

United States District Court, N.D. Ohio, E.D.

May 1, 1987.

emotional distress. These rights were allegedly breached by defendants' refusal to provide employees who retired after the expiration of a collective bargaining agreement with health/hospitalization and life insurance benefits. Pending before the Court are a plethora of motions:

(1) Defendants' motion for summary judgment, seeking dismissal of the complaint;

(2) Plaintiff's motion for partial summary judgment, on the issue of whether defendants breached the collective bargaining agreement;

(3) Defendants' motion for partial summary judgment, alternatively seeking judgment on the promissory estoppel claims if the Court does not find them preempted by federal law;

(4) Defendants' motion to dismiss plaintiffs' request for punitive and emotional distress damages; and

(5) Defendants' motion to strike plaintiffs' jury demand.

For the reasons set forth below, this Court determines that plaintiffs' contractual rights to post-retirement health and hospitalization benefits (hereinafter collectively designated as "health benefits") were breached, and that plaintiffs are entitled to partial summary judgment with respect to those benefits based upon their contract claim and some of their ERISA claims. Summary judgment cannot be granted for either plaintiffs or defendants with respect to the life insurance benefits, requiring that the parties proceed to trial on plaintiffs' federal claims. However, the pendent state claims are dismissed as preempted under § 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185 (1982) ("§ 301"), even though plaintiffs will be entitled to present a promissory estoppel claim under § 301 as a basis for their life insurance benefits. Defendants' motion to strike plaintiffs' jury demand is denied, but their motion to dismiss plaintiffs' request for punitive and emotional distress damages as ERISA remedies is granted. Defendants' motion for summary judgment on claims pursuant to § 510 of

Betty Grdina, William P. Bobulsky, Ashtabula, Ohio, for plaintiffs.

Martin T. Franey, Cleveland, Ohio, Diane E. Stanton, Atlanta, Ga., Michael S. Cecore, Jackson, Lewis, Schnitzler & Krupman, New York City, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiffs in this action seek equitable relief and damages for alleged violations of their contractual rights created by a collective bargaining agreement, and of their statutory rights created by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461 (1982 and Supp. III 1985). They also plead state causes of action of promissory estoppel and intentional and/or negligent infliction of

ERISA, 29 U.S.C. § 1140 (1982) ("§ 510") is also granted.

Jurisdiction rests on § 301 of the LMRA; §§ 502(a)(1) and 502(a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(1) and 1132(a)(3) (1982) ("§ 502(a)(1)" and "§ 502(a)(3)"); 28 U.S.C. § 1331 (1982) and pendent jurisdiction over state law claims.

## I. THE PARTIES AND THE COMPLAINT

Defendant Park-Ohio Industries, Inc. ("Park-Ohio") is a business engaged in manufacturing products. It was a party to a series of collective bargaining agreements with plaintiffs the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") and UAW's Local No. 91 ("Local No. 91") (together, "the union"). Park-Ohio employed thirty-four hourly employees who have retired since the expiration on July 11, 1983 of the most recent collective bargaining agreement between the union and Park-Ohio. These thirty-four persons, or their widowed spouses, are also plaintiffs in this action ("the individual plaintiffs"). Park-Ohio's Ohio Crankshaft Division ("Ohio Crankshaft") is the plan administrator of a benefit plan negotiated as part of the most recent collective bargaining agreement to provide health and life insurance benefits for Park-Ohio retirees, and it is also named as a defendant. Park-Ohio and Ohio Crankshaft are hereinafter collectively designated as "defendants" or "the company," and the Court does not fix the liability apportioned to each defendant in ruling upon these motions, but rather determines whether plaintiffs will be permitted to establish liability against either defendant.

The most recent collective bargaining agreement between Park-Ohio and the union, effective between July 11, 1980 and July 11, 1983 ("the 1980–83 labor agreement"), contained provisions establishing health and life insurance plans for retirees, including health insurance coverage for retirees' spouses and eligible dependents. Plaintiffs aver that these benefits were meant to be provided throughout the re-

tirees' lifetimes, outlasting the duration of the collective bargaining agreement. They argue that these lifetime retirement benefits were contractually vested when employees attained retirement eligibility during the term of the 1980–83 labor agreement.

After the expiration of the collective bargaining agreement on July 11, 1983, the union began a strike which is still unresolved. During the strike, the individual plaintiffs or their decedents, who met the pension plan's requirements for early retirement before the 1980–83 labor agreement's expiration, elected to retire. The complaint alleges that the individual plaintiffs were provided with health and life insurance benefits until April 1, 1984, when defendants terminated the benefits as a tactic for leverage in the contract negotiations. It avers that the individual plaintiffs had detrimentally relied upon the company's representations that health and life insurance benefits would be provided to employees eligible to retire before the labor agreement's expiration and who later retired.

Plaintiffs aver that defendants' termination of the health and life insurance benefits to persons retiring after July 11, 1983, or their surviving spouses, violates the 1980–83 labor agreement and is compensable under § 301 and ERISA. Plaintiffs also assert that defendants breached fiduciary duties created by §§ 404 and 406 of ERISA, 29 U.S.C. §§ 1104 and 1106 (1982) ("§ 404" and "§ 406"), and that defendants have discriminated against them in order to interfere with their rights under the labor agreement or ERISA, in violation of § 510 of ERISA. They plead that defendants' representations—that those bargaining unit employees eligible to retire before July 11, 1983 who chose to retire after the 1980–83 labor agreement expired would receive the same health and life insurance benefits as those retiring before July 11, 1983—were relied upon by the post-July 11, 1983 retirees, and that defendants should be estopped from not satisfying this promise. Finally, plaintiffs allege that the termination of the retirement benefits consti-

tutes intentional or negligent infliction of emotional distress.

The second amended complaint requests a preliminary and permanent injunction restraining Park-Ohio from refusing to abide by individual plaintiffs' vested rights in their health and life insurance benefits; damages adequate to fund lifetime health and life insurance coverage for individual plaintiffs and other union retirees similarly situated; compensatory damages, including out-of-pocket medical expenses and emotional distress of the individual plaintiffs; punitive damages; disgorgement of profits resulting from the breach of fiduciary duties; and attorneys' fees and costs.

## II. STANDARDS FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

The nature of materials properly presented in a summary judgment pleading is set forth in Fed.R.Civ.P. 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, — U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hasan v. CleveTrust Realty Investors, Inc.*, 729 F.2d 372 (6th Cir.1984). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, — U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil trials the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 2512. Although "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat a summary judgment motion, the Court is not precluded from denying a summary judgment motion where it concludes that proceeding to trial is a better course. *Id.* at 2512, 2514.

## III. THE FACTUAL BACKGROUND

The following factual synopsis is based upon the materials appended to the cross-motions for summary judgment and opposition briefs. These materials include affidavits and their attached exhibits, depositions, and answers to interrogatories. Admissions to allegations of the complaint were also considered.

This dispute, when reduced to its simplest terms, involves the interpretation of provisions in the "supplemental agreement insurance program," which constitutes Exhibit B of the 1980–83 labor agreement and

which is incorporated into that labor agreement pursuant to Article XV. *See* affidavit of Michael S. Cecere of September 24, 1986 ("Cecere aff."), at ¶ 5 and Defendants' Exhibit G. This supplemental agreement has its genesis in a six-month strike of Park-Ohio by the union in 1977. A major issue leading to the strike was whether the company would improve pension and medical benefits for its retirees. The strike ended and a contract was ratified after the company agreed to pay all of the retirees' health benefits premiums. While there was no discussion of the duration of these benefits for retirees, Cecere aff. at ¶ 2 and Defendants' Exhibit A, the union's representatives believed that the benefits would be provided throughout the lives of the retirees and their surviving spouses. *See, e.g.,* deposition of Richard Vadovski ("Vadovski dep."), at 39; deposition of Joseph Imars, at 20.

The life and health insurance provisions of the 1977–80 contract were adopted with few changes as part of the 1980–83 labor agreement. The life insurance provisions in both agreements are identical. They state:

**Life Insurance**

(a) Prior to Age 65.

1. If an employee retires prior to age 65 under the provisions of the Hourly Rate Employees Pension Plan, and has 10 or more years' participation in the insurance plan prior to such retirement, he may upon the payment of premiums for group life insurance only, continue to carry his "Group Life Insurance" until age 65, at which time the employee's contributions will cease and the "Group Life Insurance" would be reduced in accordance with Paragraph (b) below.

2. If an employee who retired under the Hourly Rate Employee Pension Plan, prior to age 65 should return to work prior to age 65 while still insured, he will be insured until age 65 for the amount of Life Insurance (and extra Accidental Death and Dismemberment Insurance) he had prior to his retirement instead of the amount provided in the schedule in Item II(a) and (b) of Exhibit B for his hourly rate. Other insurance will be as provided in Item II(c) of Exhibit B.

(b) After Age 65.

1. Except as provided in Paragraph 3 below, on the first day of the calendar month following the month in which the employee retires (at or after age 65) under the Hourly Rate Employee Pension Plan, his Life Insurance in force immediately prior hereto shall be reduced by $500.

2. On the first day of the next succeeding calendar month, the remaining life insurance shall be reduced by 2% thereof, and shall be further reduced by an equal amount on the first day of each succeeding month as follows:

If the employee has 10 or more years of participation in the insurance plan prior to retirement, such reductions shall be made until the life insurance is reduced to 1½% of the amount in force after the $500.00 reduction in (1) above, times the number of full years of participation not in excess of 20, (at age 65), but in no event to less than $600.00, and such remaining life insurance, called Continued Life Insurance, will be continued thereafter until the death of the employee.

3. If the employee has less than 10 years of participation in the insurance plan upon retirement, (at or after age 65), the insurance is reduced immediately to $500.00 upon retirement and such remaining life insurance, called Continued Life Insurance, will be continued thereafter until the death of the employee.

4. No employee contributions for Group Life Insurance are required after retirement (at or after age 65) under the Hourly Rate Employee Pension Plan.

Defendants' Exhibit G (1980–83 labor agreement), at 81–82.

The portion of the health insurance plan referring to retirees is much more succinct, but it must be read in conjunction with the provisions referring to health insurance for

active employees. The "Hospitalization" section of the 1980–83 labor contract states in pertinent part:

(a) The Company will continue to provide and pay the cost of the present Hospitalization, Medical-Surgical, Prescription Drug and Major Medical coverage (which includes dental benefits) for the individual employee (including family where requested) through the Blue Cross/Blue Shield in Northeast Ohio through December 31, 1980.

(b) Effective January 1, 1981 and during the life of this Agreement, the Company will provide and pay the cost of Hospitalization, Medical-Surgical, Major Dental, Prescription Drug and Major Medical services for the individual employee (including family where requested) through the Blue Cross/Blue Shield in Northeast Ohio.

\* \* \* \* \* \*

(c) The Blue Cross/Blue Shield Program available to active employees will continue to be available to present and future retired employees (including Blue Cross/Blue Shield Medifill Benefits to those retirees so qualifying) without cost to the retiree.

\* \* \* \* \* \*

(f) Employees actively at work on the effective date of this Agreement will remain covered. Employees not actively at work on the effective date of this Agreement and employees who are rehired after lay-off and who have retained seniority, will be covered on the first day of the month following their return to active work. Employees hired after the effective date of the Contract will be covered on the first day of the month following their 30–day probationary period.

Defendants' Exhibit G, at 77–78.

As the termination date of the 1980–83 agreement approached and negotiations of a new collective bargaining agreement commenced, hourly employees became concerned that management intended to alter the retirement health insurance benefits. Deposition of Tom Ostromek ("Ostromek dep."), at 21. Some members of the union petitioned Tom Ostromek, the newly elected president of Local No. 91, to find out whether management was contemplating changes in the benefits. Ostromek dep. at 21. In response to the petition, Ostromek met with general plant manager James Kirkhoff to discuss the future of the retirement benefits. Ostromek dep., at 22. Committeeman Joseph Kaczmarczyk was also present at the June 22, 1983 meeting. Ostromek dep., at 26; deposition of Joseph Kaczmarczyk ("Kaczmarczyk dep."), at 12.

The union and the company's accounts of this meeting differ dramatically. Ostromek and Kaczmarczyk told Kirkhoff that if retiree hospitalization benefits would be changed to the detriment of retirees, many hourly employees with retirement eligibility would stop working, resulting in the loss of valuable skills to Park-Ohio. Ostromek dep., at 26–27; Kaczmarczyk dep., at 16. They claim that Kirkhoff responded that retiree insurance benefits would not be reduced or eliminated. Ostromek dep., at 29; Kaczmarczyk dep., at 16–17. After the meeting, Ostromek posted a handwritten notice in the union hall which stated:

I have been requested to explain the pension plan benefits to a group of Union brothers tonight after work. They are concerned about possibly having their pension benefits reduced during the present contract negotiations.

The majority of the Union brothers could retire under the early retirement provisions of our pension program, but would stay if the pension benefits would not be reduced, (this includes the benefit amount, hospitalization, life insurance, etc.)

I met with the Vice President and General Manager, Jim Kirkhoff, yesterday afternoon. He was made aware of the concerns of our Union brothers and that if they choose to leave under the early retirement plan the company would lose valuable skills.

Jim Kirkhoff said the company is not going to propose a change in the benefit amount ($16). He will try to get the

hospitalization information released and will call me on Friday, June 24, 1983. Ostromek dep., at 25 and Plaintiffs' Exhibit B. Kaczmarczyk told his constituents that their retiree insurance benefits would not be cut. Kaczmarczyk dep., at 29.

Kirkhoff denies that he stated to Ostromek that there were no plans to seek reduction of all retirement benefits, but claims that he indicated merely that *pension* benefits would not be reduced. Affidavit of James B. Kirkhoff of November 6, 1986 ("Second Kirkhoff aff."), at ¶¶ 5, 6. He insists that he informed Ostromek in the June 22, 1983 meeting that Ohio Crankshaft would propose changes in hospitalization benefits for both active and retired employees. Second Kirkhoff aff., at ¶ 7. Kirkhoff indicates that he reiterated this position to Ostromek in a June 25, 1983 telephone conversation, stating that bargaining unit employees should not make retirement decisions based upon medical benefits available to retirees under the 1980–83 collective bargaining agreement. Second Kirkhoff aff., at ¶¶ 8, 9.

Several days later, Kirkhoff wrote a memorandum to his files about the June 22, 1983 meeting. The document indicated that Ostromek and Kaczmarczyk expressed concern about hourly retirees' choosing early retirement because of rumors that medical benefits would be changed. The memorandum continues:

> I re-iterated and explained at some length the necessity to reduce the present costs for hospitalization and medical benefits and that costs had gone up between 15–22 percent per year, and this could not continue if The Ohio Crankshaft Division is to survive. They expressed concern about local and national problems of rapidly increasing medical costs.
>
> I referred to the meeting on Thursday, June 23, where this entire problem was to be reviewed in detail and explained that it was a difficult and complex problem for us. I stated that our main interest was to provide protection for all employees for the major medical expenses which hardly anyone could afford, and

that certain "niceties", such as prescription drugs and certain dental benefits, maybe would be changed, as we are all concerned about coverage for hospital stays and major illnesses.

Plaintiffs' Exhibit K–2.

In late June, 1983, plaintiff Walter Kosky, an hourly employee with retirement eligibility, approached Georgianna Draught (now Ogden), whom he understood to be a pension and retirement representative for the company. Deposition of Walter Kosky ("Kosky dep."), at 13–14, 20–21. Kosky wanted to ask Draught whether he would receive retirement benefits if he retired during a post-contract strike. Kosky dep. at 21–22. In his deposition, Kosky recalled their conversation:

A I walked in her office after I told her that my supervisor had given me permission to see her about my retirement.

Q Okay. Then what did you say?

A And I asked her, point-blank, about my retirement, if the contract ends will I receive my hospitalization, my pension, and my insurance.

Q Then what did she say?

A She says, what gives you that idea. Hang in there.

Q Is that all she said?

A Primarily she said I wouldn't lose any of my benefits.

Q When did she say you wouldn't lose any of your benefits? Was this after she said hang in there?

A Before.

Q So, let me just back up again. After you posed the question that you just testified to, she said what gives you that idea, correct?

A Yes.

Q What did she say right after that?

A That I wouldn't lose my benefits and that I should hang in there because this is basically, it was a short, sweet conversation.

Kosky dep., at 24–25. Kosky indicates that he related this conversation with Draught to two coworkers, Edward Czerw and Hen-

ry Kimborowicz. Kosky dep. at 85, 89. Kosky did not retire until August, 1983, when he decided that his strike benefits were too meager for his financial needs. Kosky dep. at 46–47.

The company denies that representations were made to individual plaintiffs that they would receive retiree insurance benefits even if they retired after the 1980–83 labor agreement expired. Georgianna Draught denies that she made such a representation to Kosky; rather, she testified that she told Kosky that there were no guarantees that he would receive the same benefits as pensioners who retired before the contract expired. *See* affidavit of Diane E. Stanton ("Stanton aff."), at ¶ 1 and attached Exhibit A. Edmund Wientczak, the company's benefits manager, states that he told numerous hourly employees who inquired about what health benefits they would receive if they retired during a strike that "I don't know what it would be like after the contract expired and if you wanted to play it safe you'd retire no later then [sic] July 1st." Stanton aff., at ¶ 2 and attached Exhibit B.

On July 6, 1983, the company presented the union with its proposal suggesting that retiree health benefits be terminated. Cecere aff., at ¶ 3 and Defendants' Exhibit N. The union's counterproposal was that retiree health insurance benefits not be reduced. Vadvoski dep., at 45–46. After the 1980–83 labor agreement expired on July 11, 1983, the union began a strike against the company, and no successor collective bargaining agreement has been negotiated. Plaintiffs' First Amended Complaint, at ¶¶ 7, 8 and Defendants' Answer, at ¶¶ 7, 8.

As the strike continued, bargaining unit employees who were eligible for retirement before July 11, 1983 began to retire, and retirement insurance coverage was provided for those retirees from July, 1983 until April 1, 1984. Deposition of Benjamin M. Kozman ("Kozman dep."), at 38–39. Two individual plaintiffs indicate that they were told that they were entitled to lifetime health insurance in retirement exit interviews occurring following the expiration of the 1980–83 labor agreement. *See* Plaintiffs' Exhibit P–4 (Klemence Wojtkiewcz Answers to First Interrogatories), at No. 6; Plaintiffs' Exhibit P–7 (Lazar Vukcevic Answers to First Interrogatories), at No. 7. The company denies these assertions. Affidavit of Benjamin M. Kozman, at ¶ 5; affidavit of Lee De Mastry of November 7, 1986, at ¶ 6. Philomena Bodnarik, widow of a Park-Ohio retiree, received a document from the company on October 31, 1983 describing his health insurance. The document indicated that there would be no deduction for health insurance and that hospitalization insurance would be continued and paid by the company for a surviving spouse of a retiree. *See* Plaintiffs' Exhibit P–6 (Philomena M. Bodnarik Answers to First Interrogatories), at No. 7 and Plaintiffs' Exhibit C.

The company contends that each postcontract retiree was advised that the retiree insurance benefits were being provided only on a temporary basis. Affidavit of Lee De Mastry of September 17, 1986, at ¶ 5 and Defendants' Exhibit K. It explains that it provided insurance benefits to these retirees on a temporary basis in order to implement all changes in health insurance coverage for its employees at one time. Affidavit of James B. Kirkhoff of September 26, 1986, and Defendants' Exhibit I (Defendants' Responses to First Interrogatories), at No. 36. On April 1, 1984, the company terminated the retirement insurance benefits for those bargaining unit employees retiring after July 11, 1983. Defendants' Exhibit L. This termination was effected to reduce the company's operating expenses. Deposition of James B. Kirkhoff ("Kirkhoff dep."), at 30–31; Kozman dep., at 51. However, the company has continued to provide retiree insurance benefits to former employees retiring before July 11, 1983, believing that it is contractually obligated to do so. Kozman dep., at 37. The UAW has paid for health and life insurance benefits for the post July 11, 1983 retirees or their beneficiaries since the company terminated its coverage. Vadvoski dep., at 52–53.

## IV. THE § 301 CLAIMS FOR BREACH OF THE 1980–83 LABOR AGREEMENT

Unlike many other cases decided in the Sixth Circuit, this litigation does not re-

quire this Court to determine whether the collective bargaining agreement created lifetime benefits for retirees subject to its provisions. Defendants admit that such lifetime benefits have been established by the labor contract. See Defendants Park-Ohio Industries, Inc. and Ohio Crankshaft Division's Reply to Plaintiffs' Motion for Partial Summary Judgment and Memorandum in Support Thereof and in Opposition to Defendants' Motion for Summary Judgment ("Defendants' reply brief"), at 3; Defendants' Exhibit I, at No. 36. Instead, the breach of contract issue is whether the individual plaintiffs, who were eligible for early retirement before expiration of the 1980–83 labor contract but did not retire until the contract had expired, are within the group of "present and future retired employees" entitled to lifetime benefits.

■ Principles which have been well-developed by the Sixth Circuit control this Court's determination of whether the collective bargaining agreement created vested lifetime health and life insurance benefits for the individual plaintiffs. Federal rules of decision must be applied in cases involving employee welfare benefit plans, even where ERISA does not provide governing law. *In re White Farm Equipment Co.*, 788 F.2d 1186, 1191 (6th Cir. 1986). However, traditional contract rules will be applied to the interpretation of labor contracts where no substantive federal principles exist, so long as their application is not inconsistent with federal labor policies. *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc.* 716 F.2d 1476, 1479, 1487 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Even though *Yard-Man* and its Sixth Circuit progeny were cases involving the insurance benefits of employees who had retired during the term of a collective bargaining agreement (with one exception discussed below), their principles of construction of collective bargaining agreements are obviously applicable to the interpretive problem before this Court.

This Court's examination of the rights created for retirees by the collective bargaining agreement begins with a construction of the contract itself. First, the Court evaluates the explicit language of the provision which arguably creates lifetime benefits to determine whether it is ambiguous. *Yard-Man*, 716 F.2d at 1479. If the key provision of the collective bargaining agreement is ambiguous, the court must "look to other provisions of the collective bargaining agreement for evidence of intent and an interpretation which is harmonious with the entire document." *Id.* at 1480. Finally, extrinsic evidence of the parties' intent may be considered, although the Sixth Circuit has demonstrated a proclivity for interpreting the contract within its four corners. *Weimer v. Kurz-Kasch, Inc.*, 773 F.2d 669, 675 n. 4, 676 n. 6 (6th Cir.1985).

## A. *Health Insurance Benefits*

■ This Court begins by examining the provision incorporated into the 1980–83 labor agreement which is relied upon by plaintiffs and defendants. Subsection (c) of the "Hospitalization" portion of Exhibit B ("subsection (c)") states:

> The Blue Cross/Blue Shield Program available to active employees will continue to be available to present and future retired employees (including Blue Cross/Blue Shield Medifill Benefits to those retirees so qualifying) without cost to the retiree.

Plaintiffs and defendants focus upon the words "present and future retired employees." Plaintiffs urge that "future" retirees must mean employees eligible to retire during the agreement who retire after its expiration. The company argues that "present" retired employees are those already retired, while "future" retired employees are those who will take retirement status within the duration of the collective bargaining agreement. Defendants' construction requires that the words "present" and "future" be accorded a meaning on July 11, 1980, the effective date of the collective bargaining agreement, which fixes the membership of each respective group of retirees. In other words, defend-

ants' construction mandates that to determine whether a retiree is a "present" or "future" retiree within the meaning of the contract, one must consider whether he or she had taken retirement before the effective date of the contract. Such a construction makes this provision strangely static. Collective bargaining agreements are generally susceptible of interpretation on *any* date during their lives, permitting fluidity of the class of employees and former employees covered therein. Thus, a collective bargaining agreement's terms will usually be read to reach employees hired or returning to active status after the contract becomes effective, as well as employees active on the effective date. The company's construction of subsection (c), which requires that the two classes of retired employees retain their makeup as of the contract's effective date, is a marked exception to this general method of construction, and it cannot be accepted when the remainder of the "Hospitalization" section is examined.

■ The portions of the contract which provide the insurance benefits must be read as a whole, rather than as phrases in isolation, in order to decide whether the contractual language is ambiguous. *Weimer*, 773 F.2d at 674–75; *Policy v. Pressed Steel Co.*, 770 F.2d 609, 614–15 (6th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986). Thus, it is necessary to examine the surrounding provisions establishing health insurance for active employees. Subsection (f) of the "Hospitalization" section of Exhibit B defines the class of active employees entitled to benefits. It conclusively shows that newly hired and rehired employees are eligible for these benefits after meeting certain requirements. These new employees, as well as employees working on the effective date of the collective bargaining agreement, constitute the "individual employees" afforded health benefits by subsections (a) and (b) of the "Hospitalization" section. They also make up the class of "active employees" referred to in subsection (c), the very provision conveying benefits to "present and future retired employees." It would be anomalous for the "active employees" class of subsection (c) to be fluid over the course of the agreement, while the "present and future retired employees" classes are fixed as of the day the agreement became effective.

■ A different construction of subsection (c) would appear to alleviate this inconsistency. The company might urge that the words "present and future" be read each day of the duration of the contract in order to define a retiree's status on that date. However, this argument is self-defeating, since the contract could be read by any person retiring during the term of the contract on his or her retirement date, with the result that all persons retiring during the contract's term would be "present" retired employees. The word "future" would therefore be superfluous, except on the last date of the term of the contract—resulting in exactly the interpretation urged by plaintiffs. This alternative construction, then, would actually be essentially identical to a construction of the word "present" as meaning any person retiring during the term of the collective bargaining agreement, and "future" as meaning those retiring after the agreement's expiration.

Plaintiffs persuasively argue that the defendants are attempting to construe subsection (c) as though it read "past and present retired employees," in which case defendants would prevail under either method of interpretation discussed above. Defendants' construction, plaintiffs correctly contend, gives the word "future" absolutely no meaning. This Court must conclude that the "Hospitalization" portion of Exhibit B unambiguously provides bargaining unit employees who had eligibility to retire before July 11, 1983 with vested health insurance benefits, even though some of these bargaining unit employees might choose to retire after the 1980–83 labor agreement was terminated.

■ Specific principles of construing labor agreements which were enunciated in *Yard-Man* support this Court's construction of the unambiguous language of subsection (c). The *Yard-Man* court noted that a provision stating that an early re-

tiree's health care premiums would be paid by the company when that retiree reached age sixty-five would be an illusory promise if the benefits were not guaranteed after the expiration of the contract, since many early retirees would not reach age sixty-five and become eligible for such a deferred benefit within the short life of the contract. This otherwise "illusory promise" supported an interpretation that benefits were meant to continue after the contract had expired. 716 F.2d at 1481. The case before this Court presents what could be considered an "inverse illusory promise." Here, longtime employees entitled to contractually vested health benefits would lose them merely because they chose to not retire at an early date. This Court is unaware of any similar situation where vested benefits are forfeited because an employee remains part of the bargaining unit at the expiration of the collective bargaining agreement. Certainly, the dissipation of benefits otherwise vested would render them "illusory."

█ In addition to the content of a collective bargaining agreement, the Sixth Circuit has identified two considerations favoring survival of retiree benefits beyond the life of the contract. First, the court stated that retiree benefits normally vest, because unions and management are not required to negotiate on behalf of retired employees, and current employees want to guarantee their retirement benefits before they depart from the bargaining unit. *Yard-Man,* 716 F.2d at 1482; *Policy,* 770 F.2d at 613. Second, the court categorized retiree benefits as "status benefits," which ostensibly continue so long as the status of retiree continues. Thus, there is an inference that retiree benefits are contractually vested when provided for in a labor agreement. *Yard-Man,* 716 F.2d at 1482. This inference in favor of vesting does not rise to the level of a presumption. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Cadillac Malleable Iron Co.,* 728 F.2d 807, 808 (6th Cir.1984). However, failure to give effect to these two propositions may result in reversible error. *See Policy,* 770 F.2d at 616.

█ The company argues that these contextual considerations explained in *Yard-Man* support their position that retirement status must actually be taken, quoting the following passage:

> The employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees. If they forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements.

716 F.2d at 1482. The company emphasizes the words "once they retire." However, this language is actually more supportive of plaintiffs' position. Plaintiffs have presumably given up wages, relying on the creation of vested benefits when they reach retirement eligibility. Moreover, they have presumably elected to not take early retirement in reliance on the collective bargaining agreement seemingly vesting lifetime health benefits. The "status benefit" consideration also creates an inference that plaintiffs are entitled to their benefits. *Yard-Man* indicated that retiree benefits are by inference continued so long as the beneficiary remains a retiree. 716 F.2d at 1482. Therefore, someone who returned to work after retiring would lose those benefits while working, but he or she would by inference regain those benefits upon resuming retiree status. It is not necessary, therefore, that a beneficiary actually be retired to have vested benefits which will be payable when retirement status is taken, although such benefits are not payable when the beneficiary is not retired.

Defendants present three main arguments, scattered throughout their numerous briefs, which discuss the issue of interpreting the collective bargaining agreement, and urge reasons why the plaintiffs cannot prevail on their § 301 claim for health insurance benefits. First, they submit that the contractual language cannot be construed to provide these benefits to the individual plaintiffs. Second, they as-

sert that the extrinsic evidence demonstrates that the union and the company did not intend lifetime benefits to vest for employees who had not actually taken retirement. Third, they argue that the extrinsic evidence shows that there was no "meeting of the minds" between the union and the company on the issue of this litigation, requiring that judgment be entered for the company. These contentions all fail.

The company relies solely upon the case of *Plis v. MGD Graphics Systems, Inc.*, No. 79–C–4787 (N.D.Ill. Nov. 30, 1981), *aff'd mem.*, 714 F.2d 146 (7th Cir.1983), in support of their contention that the labor contract must be read to exclude plaintiffs from the class of retirees eligible for lifetime health insurance benefits. In *Plis*, a retiree who had not retired during the term of a collective bargaining agreement argued that he was entitled to vested health and welfare benefits because he was eligible for retirement while the collective bargaining agreement was in force. The district court examined the language of the collective bargaining agreement and concluded that Plis was required to retire during the labor contract's term in order for the retirement benefits to vest. Defendants quote:

> [E]ach ... collective bargaining agreement, and the pension plan in existence pursuant to each agreement, constituted an offer to any employee who was qualified for retirement under that plan that he could accept by retiring during the term of the agreement. Once an employee took that action, the offer-and-acceptance required to constitute a contractual obligation was complete.

*Plis*, slip op. at 3 (quoting *Hurd v. Hutnik*, 419 F.Supp. 630, 645 (D.N.J.1976)). While indicating that this "offer and acceptance" theory must be applicable to the contractual vesting of benefits in this case, defendants ignore the specific language construed by the *Plis* court. The labor contract in *Plis* contained the language "*shall be eligible* to receive retirement benefits *upon retirement* from employment with the Company after reaching age 65...." (emphasis added). That language clearly established that taking retirement status was a requirement for eligibility. Such language is absent from the case at bar; *Plis*, then, has little persuasive force in this action.

■ The company also asserts that extrinsic evidence requires this Court to adopt its interpretation of the labor contract. It relies heavily upon evidence that the union and the company did not discuss whether retiree benefits would vest for life. Defendants also assert that plaintiffs' conduct shows that benefits were not intended to be vested upon meeting eligibility for retirement. They argue that if plaintiffs had negotiated such benefits, there would have been no need for Ostromek to meet with Kirkhoff to discuss employees' concerns that retirement benefits would be eliminated in the next contract. Finally, the company points to its evidence that Kirkhoff and Wientczak dissuaded employees who approached them from delaying retirement in reliance on health insurance benefits created in the 1980–83 labor agreement, and that Wientczak counseled some employees to retire before the contract lapsed in order to assure that health benefits would be guaranteed.

Plaintiffs respond with their own extrinsic evidence. They contest Kirkhoff's account of the meeting with Ostromek and Kaczmarczyk, providing evidence that Kirkhoff informed the union representatives that all retiree insurance benefits would be maintained for those employees electing to waive early retirement. They present Kosky's account of his conversation with Draught, which Draught denies. Plaintiffs adduce evidence of post-contract representations that recent retirees or their surviving spouses would receive insurance benefits. These representations are also disputed by the defendants. Finally, plaintiffs rely upon the provision of benefits for post-contract retirees between the ending of the contract and April, 1984. The company has offered an explanation for this action, as well as evidence that recipients of those benefits were notified that the benefits were provided on a temporary basis.

Since there are obvious factual disputes with respect to the extrinsic evidence, it

would appear that summary judgment cannot be entered for either plaintiffs or defendants. However, the Sixth Circuit has indicated that extrinsic evidence need not be considered in construing a labor agreement when the controlling language is unambiguous. In *Local Union No. 337 v. Armour and Co.*, 700 F.2d 327 (6th Cir. 1983), the company complained on appeal that the trial court had admitted evidence of the purpose of awarding severance pay and the practice of the company and in the industry of not awarding severance pay to employees similarly situated to the plaintiff, but the court then relied solely on the language of the collective bargaining agreement. The Sixth Circuit responded, "The contract language previously quoted is clear and unambiguous and there are no other provisions of the contract which cast doubt on its meaning." *Id.* at 329. Because it found that the trial court had properly construed the contractual language, the circuit court affirmed the lower court's decision. *Id.* This tendency to interpret unambiguous labor agreements within their four corners has been approved in the context of litigation over whether retiree benefits are contractually vested. *See Weimer*, 733 F.2d at 675 n. 4, 676 n. 6.

In this case, this Court has found that the contractual language creating retiree health insurance is susceptible only to the construction urged by plaintiffs. There is no other contractual language which contains any suggestion that this construction is incorrect. Therefore, summary judgment for plaintiffs on the § 301 claim for health insurance benefits is not precluded by factual disputes over extrinsic evidence.[1]

After having filed a reply brief, the company filed a brief discussing "supplemental authority" that it deems controlling—the case of *United Steelworkers of America v. North Bend Terminal Co.*, 752 F.2d 256 (6th Cir.1985). In *North Bend*, the employ-

er ceased contributions and terminated a pension plan when it decided to close its production facilities. The issue was whether the language requiring the company "to make contributions to a pension plan" required the employer to fully fund the pension plan, or whether it required contributions only during the operation of the production facilities. The Sixth Circuit determined that either interpretation could be supported by the contested language. The Sixth Circuit reviewed the evidence and concluded:

> We cannot say, however, that there was ever a meeting of the minds that North Bend would be obligated to continue funding the pension plan after it closed the facility. The collective bargaining agreement itself is ambiguous, but this much is clear: North Bend was obligated to make contributions to the plan. There is no convincing indication that North Bend was obligated to fund the plan fully. North Bend's own contemporaneous good-faith interpretation, embodied in the formal plan documents, was that it had no post-termination liability. The parties themselves have stipulated that post-termination liability was not even discussed in the negotiations.

*Id.* at 260. Having determined that there was a mutual misunderstanding, the court faced the dilemma of how to resolve it. It refused to find that there was no contract, since the agreement between the union and employer appeared fully performed in every other way. It also declined to supply its own term, since this matter is not among the few terms typically supplied by courts. Instead, the court adopted the approach of Judge Friendly in the famous "chicken" case, *Frigaliment Importing Co. v. B.N.S. International Sales Corp.*, 190 F.Supp. 116 (S.D.N.Y.1960). In *Frigaliment*, the buyer argued that the word "chicken" meant young fryers, while the seller urged that it meant less valuable stewing chickens. Judge Friendly ruled

---

1. Of course, summary judgment for plaintiffs is premised upon the contractual language, rather than plaintiffs' argument that *UAW v. Cadillac Malleable Iron Co.*, No. G82–75 CA1 (W.D.Mich. March 30, 1983), *aff'd*, 728 F.2d 807 (6th Cir.

1984), is controlling. *Cadillac Malleable*'s rationale depends entirely upon evaluation of extrinsic evidence, *i.e.*, representations made to employees.

that since the seller's subjective understanding of the word "chicken" as used in the contract corresponded with an objective meaning of the term, the buyer did not meet its burden of proving that its interpretation was correct. Adopting this rationale, the Sixth Circuit concluded:

We hold that, where there is a mutual misunderstanding as to a contract term and the options discussed in the previous paragraph are not open to the court, the court will rule against the party bearing the burden of proof. Because the whole burden of proof is on the party alleging breach of a collective bargaining agreement under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, *see UAW v. Roblin Industries,* 561 F.Supp. 288, 297 (W.D.Mich.1983); *General Warehousemen's Union Local 852 v. Reliance Electric Co.,* 386 F.Supp. 1303, 1307 (S.D.N.Y.1973), we hold for defendants.

*Id.* at 261.

■ Defendants contend that assuming that plaintiffs' interpretation of the phrase "present and future retired employees" is viable, they are entitled to summary judgment. Because plaintiffs adduce no evidence to support their interpretation, defendants argue, plaintiffs cannot meet their burden of proof. Defendants' logic fails because this Court has concluded that the contract is unambiguous, and that its meaning is that claimed by plaintiffs. It is of no consequence that the parties to the collective bargaining agreement did not discuss the issue in negotiation. The *North Bend* court continued:

We emphasize that our holding is bound to its specific facts. In particular, we do not hold that an employer's liability for full funding of a pension plan must be separately expressed if it is to be bound. Had the whole provision of the *actual contract* read, "The Company agrees to fund a defined benefit pension plan providing a monthly benefit of $8.00 per year of service," that might well have bound the employer fully.

*Id.* (emphasis in original). Like the example proposed by the *North Bend* court, the language to be construed by this Court is unambiguous and does not indicate a mutual misunderstanding.

In conclusion, this Court finds that the words "present and future retired employees" can mean only that employees who attained retirement criteria during the term of the 1980–83 contract and who retired after the contract's expiration are accorded contractually vested health insurance benefits. Because this language is unambiguous, the company's arguments in opposition to plaintiffs' § 301 claim on health benefits fail.

### B. *Life Insurance Benefits*

Practically all of the briefing of the breach of contract claim focuses upon the health insurance benefits. Defendants indicate that the paucity of discussion by plaintiffs of the life insurance benefits means that plaintiffs' motion for summary judgment is limited to health insurance benefits. They also argue that the group life insurance policy in effect during the 1980–83 labor contract lapsed when the union refused to make payments; therefore, no life insurance policy was in effect when plaintiffs retired. For these factual reasons and because plaintiffs have purportedly abandoned their life insurance claims, defendants ask for summary judgment on this issue.

■ Plaintiffs respond by stating that the reasons advanced in their brief in support of their summary judgment motion apply to life insurance benefits as well as health benefits. They also correctly point out that defendants' reliance upon their failure to continue life insurance contributions is inappropriate, since that very failure is at issue in this litigation. Defendants' refusal to pay these benefits does not establish that they are not contractually bound to do so.

■ This Court finds that the provisions creating the life insurance benefits are ambiguous, capable of interpretation to provide individual plaintiffs with vested benefits as well as to permit defendants to discontinue these payments. These provi-

sions are set forth in the "Life Insurance" portion of Exhibit B of the collective bargaining agreement, and they establish the life insurance benefits available to persons who retire before and after attaining age sixty-five. An exemplar of these provisions is subsection (b)(4), which states:

> No employee contributions for Group Life Insurance are required after retirement (at or after age 65) under the Hourly Rate Employee Retirement Pension Plan.

Throughout the "Life Insurance" section, the word "retire" is followed by the words "under [the provisions of] the Hourly Rate Employee Pension Plan." Apparently conceding that these provisions establish lifetime benefits for pre-strike retirees as a matter of law, defendants are providing life insurance benefits to persons retiring before the expiration of the collective bargaining agreement. Memorandum of Law in Support of Defendants Park-Ohio Industries, Inc. and Ohio Crankshaft Division's Motion for Summary Judgment ("Defendants' summary judgment memo"), at 6 n. 2.

The words "under [the provisions of] the Hourly Rate Employee Pension Plan" can be construed as extending the life insurance benefits beyond the term of the collective bargaining agreement. Section 15.1 of that pension plan, Defendants' Exhibit M, states in part:

> It is the hope and expectation of the Company that the Plan will be a permanent program. However, the Company necessarily reserves the right, to be exercised by action of its Board of Directors, to terminate this Plan in whole or in part at any time....

There is no indication in the record that the pension plan has been terminated, and there are several indications that the individual plaintiffs are receiving pension benefits. Since the pension plan has apparently survived the collective bargaining agreement and the individual plaintiffs or their decedents retired under its terms, the literal terms of the "Life Insurance" section have been complied with, and the individual plaintiffs could be entitled to contractually vested benefits despite the expiration of the collective bargaining agreement.

On the other hand, the language "under [the provisions of] the Hourly Rate Employee Pension Plan" can be construed as simply incorporating the retirement criteria of the pension plan, without affecting the duration of the life insurance provisions at all. Complicating this issue further is subsection (g), which provides:

> All benefits will be subject to the limitations set forth in the policy or policies under which this protection is made available and to the rights reserved to the Company to modify or discontinue the plans.

It is unclear how the "Life Insurance" provisions would be modified or discontinued under this subsection, or whether such steps were taken. Therefore, trial on issues of fact created by extrinsic evidence will apparently be necessary to resolve the issue of whether the company's decision to not provide life insurance benefits to the individual plaintiffs is a § 301 violation, and summary judgment is denied.

## V. THE ERISA CLAIMS

Plaintiffs seek the protection of ERISA, as well as § 301 of the LMRA, in order to guarantee their lifetime health and life insurance benefits. This Court has already held as a matter of law that plaintiffs are contractually entitled to receive their health benefits, although it has declined to find that the life insurance benefits have vested as a matter of law. Since plaintiffs also seek damages for the creation of an independent insurance fund and disgorgement of profits, remedies presumably available under the equitable principles of trusts codified by ERISA, and not available under the legal doctrines of contracts, this Court will also discuss the parties' ERISA arguments.

### A. Claims for Breach of Fiduciary Duties

The amended complaint avers that Ohio Crankshaft acted as a fiduciary by administrating the health and life insurance benefit plans, as an agent for Park-Ohio. Thus, plaintiffs assert, defendants have subjected themselves to ERISA's fiduciary duties to

act solely for the benefit of the participants and not for defendants' own interests. Defendants move for summary judgment on these claims. While plaintiffs' summary judgment motion does not include these claims, their brief in response to defendants' motion basically contends that they are entitled to summary judgment on this issue if they prevail upon their § 301 arguments. Because this Court finds that there are no disputed issues of material fact on these claims as they relate to health insurance, the Court enters partial summary judgment for plaintiffs. It denies summary judgment to either side with respect to the alleged breach of fiduciary duty arising from the company's refusal to provide individual plaintiffs with life insurance.

An understanding of the parties' respective arguments requires some familiarity with the ERISA statute. Title 29 U.S.C. § 1002 (1982) defines "employee welfare benefit plans" [2] and expressly distinguishes them from "employee pension benefit plans." [3] Both are deemed to be "employee benefit plans" regulated by ERISA.[4] In the following section, however, the statute limits the scope of the restrictions imposed upon welfare benefit plans. Title 29 U.S.C. § 1003(a) (1982) states that ERISA governs employee benefit plans except as otherwise provided in, *inter alia,* §§ 1051 and 1081 [5]; 29 U.S.C. §§ 1051(1) and 1081(a)(1) (1982), in turn, exempt employee welfare benefit plans from ERISA's stringent participation, vesting, and funding standards.[6]

■ Employee welfare benefit plans are not exempted from ERISA's standards governing fiduciary responsibility.[7] Thus,

2. Title 29 U.S.C. § 1002(1) (1982) provides:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization or by both, to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

3. Title 29 U.S.C. § 1002(2) (1982) provides:

The terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(A) provides retirement income to employees, or

(B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

4. Title 29 U.S.C. § 1002(3) (1982) provides:

The term "employee benefit plan" or "plan" means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

5. Title 29 U.S.C. § 1003(a) (1982) states:

Except as provided in subsection (b) of this section and in sections 1051, 1081, and 1101 of this title, this subchapter shall apply to any employee benefit plan if it is established or maintained—

(1) by any employer engaged in commerce or in any industry or activity affecting interstate commerce; or

(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce, or

(3) by both.

6. Title 29 U.S.C. §§ 1051 and 1081(a) (1982) introduce Parts 2 and 3, respectively, of ERISA, which concern participation, vesting and funding requirements. They state in identical language:

This part shall apply to any employee benefit plan described in section 1003(a) of this title (and not exempted under section 1003(b) of this title) other than—

(1) an employee welfare benefit plan;

\*　　\*　　\*　　\*　　\*　　\*

7. Title 29 U.S.C. § 1101 (1982) introduces Part 4 of ERISA, which establishes fiduciary duties. It states in pertinent part:

(a) This part shall apply to any employee benefit plan described in section 1003(a) of this title (and not exempted under section 1003(b) of this title), other than—

the company must abide by its fiduciary duties under ERISA if it is properly categorized as a fiduciary of its health and life insurance benefits plans. Section 404 of ERISA sets forth standards of care which must be observed by a fiduciary administering a plan, which must be "solely in the interest of the participants and beneficiaries." [8] In addition, § 406 of ERISA prohibits transactions which involve assets of the plan and which inure to the fiduciary's benefit.[9]

 A "fiduciary" under ERISA is defined by 29 U.S.C. § 1002(21)(A) (1982), which states in pertinent part:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent ... (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Defendants do not contest plaintiffs' assertions that defendants are fiduciaries, because Ohio Crankshaft is the plan administrator of the hospitalization and life insurance plans. Since there is ample evidence to support this contention, the Court holds that defendants are fiduciaries subject to the duties of § 404 and § 406. *See* Defendants' Exhibit P (Summary Plan Description for the Group Hospitalization Plan), at 3; Defendants' Exhibit O (Summary Plan Description for the Group Life Insurance Plan), at 12; Kirkhoff dep., at 25.

Instead, defendants rely upon a group of appellate court decisions holding that a plan administrator's fiduciary duties created by ERISA are not implicated when the employer attempts to eliminate or amend employee welfare benefits which are not vested. *See Amato v. Western Union International, Inc.*, 773 F.2d 1402, 1416–1417 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986); *United Independent Flight Officers v. United Air Lines, Inc.*, 756 F.2d 1262, 1268 (7th Cir.1985); *Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406, 410–411 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). They urge that the case before the Court is controlled by this Court's decision in *Thonen v. McNeil-Akron, Inc.*, 661 F.Supp. 1252 (N.D.Ohio 1986), where it held that renegotiation of health care benefits with retirees by an employer/plan administrator did not breach the fiduciary duties under § 404 with respect to a majority of the retirees.

---

(1) a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees; or

(2) any agreement described in section 736 of Title 26, which provides payments to a retired partner or deceased partner or a deceased partner's successor in interest.

**8.** Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1) (1982) provides:

> Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

**9.** Section 406(b) of ERISA, 29 U.S.C. § 1106(b) (1982) states:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

In *Thonen,* this Court analyzed the scope of the fiduciary duty owed to recipients of benefits which do not vest pursuant to ERISA, relying upon the opinion of the Third Circuit Court of Appeals in *Viggiano v. Shenango China Division of Anchor Hocking,* 750 F.2d 276 (3rd Cir.1984). The *Viggiano* court was presented with a dispute involving the termination of group hospital benefits for employees during a strike. The union contended that the termination was a violation of the company's fiduciary duties, while the employer maintained that the collective bargaining agreement permitted it to terminate the benefits at the agreement's end. Although the court concluded that the dispute must be first adjudicated through the grievance procedure of the collective bargaining agreement rather than through immediate recourse to judicial remedies, it was confronted with an underlying issue of the essence of the fiduciary duty owed to employee welfare benefit plans.

Noting that health benefits are created by contract, the court stated that ERISA would not be implicated by the employer's negotiating a discontinuance of the hospitalization benefits in its new contract. *Viggiano,* 750 F.2d at 280. However, the court also recognized that the parties could have negotiated health benefits intended to outlive the expired collective bargaining agreement. *Id.* Since such a continuing duty would be grounded in the collective bargaining agreement, the court determined that the union's ERISA claims should be held in abeyance while the parties resolved the threshold issue of whether the benefits were meant to outlive the contract through grievance procedure. If arbitration established that continuing health benefits had not been anticipated by the collective bargaining agreement, the district court was instructed to dismiss the union's ERISA claims. *Id.* at 281. If the benefits continued beyond the termination of the collective bargaining agreement, however, the trial court was to proceed with the ERISA claims. *Id.*

Following its review of *Viggiano,* this Court concluded:

The *Viggiano* decision delineates permissible employer conduct with respect to medical benefits from that which is a violation of the fiduciary duties created by ERISA. The right to receive such benefits is created by labor agreements, and the employer is not prohibited from renegotiating them in order to discontinue or reduce the benefits. If the employer is contractually obligated to pay medical benefits, however, a unilateral discontinuance or reduction by the employer would violate its fiduciary duties. *See United Independent Flight Officers [v. United Airlines],* 756 F.2d [1262] at 1269 [7th Cir., 1985] (no fiduciary duty breached by administrator by refusing to proffer distribution option until that option was included in the plan at the end of negotiations with union).

*Thonen,* at 1266.

Upon reexamination of *Viggiano,* however, this Court concludes that its analysis in *Thonen* is somewhat distorted. Central to this Court's revision of its *Thonen* analysis is its consideration of the rationale of *Amato, United Independent Flight Officers,* and *Sutton* in conjunction with *Viggiano. Amato, United Independent Flight Officers,* and *Sutton* discuss the separation of the employer and plan administrator statuses of an entity performing both functions. These cases indicate that ERISA's fiduciary duty attaches when such an entity performs the actions of a plan administrator, but not when it acts in its capacity as employer. For example, *Amato* states, "[The district court] concluded that ERISA permits employers to wear 'two hats,' and that they assume fiduciary status 'only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA. We agree." 773 F.2d at 1416–17 (citation omitted). These opinions have concluded that renegotiation of welfare benefit plans not vesting under ERISA is an "employer" function. Under the "two hat" analysis, then, there is no breach of fiduciary duty by such actions, because the fiduciary duties do not attach.

The unstated goal in *Viggiano* is to determine whether the employer acted in its capacity as employer or plan administrator. The court ordered that the case should be sent to arbitration to establish whether the health benefits were contractually vested or had elapsed with the collective bargaining agreement. It opined that the ERISA action should proceed only if the labor agreement had created continuing benefits. Its implicit conclusion was that the employer acted as a plan administrator if the benefits were continuing, while it acted as an employer if it merely attempted to eliminate benefits which had lapsed.

This Court's analysis in *Thonen* may have been misleading in that it suggested that a breach of fiduciary duties would be established by finding that retirees' benefits were contractually vested and that the benefits had been unilaterally terminated, rather than renegotiated. This formulation is somewhat simplistic. Instead, this Court should have indicated that the factfinder must determine that the benefits are contractually vested before it can proceed with an analysis of whether ERISA's fiduciary duties are violated. The *Viggiano* court implied that this latter framework is appropriate by stating that if arbitration established that the employer had a continuing duty to provide medical benefits, "the district court shall then consider the merits of the ERISA claim." 750 F.2d at 281. Therefore, a two-step analysis is appropriate in cases where welfare benefit plans have been terminated. First, the Court must determine whether a contractual obligation to continue providing such benefits exists. If not, no fiduciary duties under ERISA are implicated, and the claim should be dismissed. If the Court finds that a contractual obligation to continue providing such benefits does exist, then it must proceed to analyze whether those fiduciary duties have been violated by the termination.

This Court has concluded as a matter of law that the company is contractually obligated to continue providing health insurance benefits to the individual plaintiffs. Thus, the Court must consider whether defendants' termination of the health insurance benefits violated their fiduciary duties under § 404 and § 406.

Section 404 prohibits actions by a fiduciary which are not "solely in the interests of participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries...." The participants' and beneficiaries' interests, then, must be the prism through which defendants' conduct is viewed:

> Although officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves, their decisions must be made with an eye single to the interests of the participants and beneficiaries. Restatement of Trusts 2d § 170 (1959); II Scott on Trusts § 170, at 1297–99 (1967) (citing cases and authorities); Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978). This, in turn, imposes a duty on the trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan.

*Donovan v. Bierwirth*, 680 F.2d 263, 271 (2nd Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Similarly, § 406 prohibits a fiduciary from dealing with a plan's assets "in his own interest or for his own account...." Read together, § 404 and § 406 prohibit a fiduciary from taking action on its own behalf that is detrimental to the interests of the participants and beneficiaries.

 Defendants concede that their decision to terminate the individual plaintiffs' health benefits was "an economic decision." Defendants' summary judgment memo, at 8. They terminated these benefits to reduce their operating costs. Kirkhoff dep., at 30–31; Kozman dep., at 51. No other purpose for their action, particularly none promoting plaintiffs' interests, is suggested. Therefore, this Court must

find that the company violated its fiduciary duties under § 404(a)(1) and § 406(b)(1) by terminating individual plaintiffs' health benefits. Accordingly, summary judgment is granted for plaintiffs on these claims with respect to the health insurance benefits.[10] The breach of fiduciary duties claims involving the life insurance benefits await the resolution at trial of the § 301 issue, since this Court cannot determine whether the company was restricted by the fiduciary duties until that threshold issue is adjudicated.

As a practical matter, the two-step analysis now propounded by this Court is quite similar to that set forth in *Thonen*. It is difficult to conceive of a situation in which a unilateral termination of vested benefits will not violate one of ERISA's fiduciary duties. On the other hand, a compromise over a dispute involving welfare benefits does not appear to breach these duties. *Cf. Yardman*, 716 F.2d at 1485. Therefore, this Court's holding in *Thonen* that the employer had not violated a fiduciary duty with respect to those retirees with whom it had negotiated "accords and satisfactions" would not be altered. Since defendants did not attempt to resolve a dispute with respect to the health benefits by settling with the individual plaintiffs, this case is factually distinguishable from *Thonen*.

B. *Claims under § 510 of ERISA*

Plaintiffs' second cause of action also includes a cause of action pursuant to § 510 of ERISA, which states:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the

plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140 (1982). Defendants move for summary judgment on this claim, urging that: (1) the individual plaintiffs did not suffer adverse employment action contemplated by § 510; and (2) § 510 is not implicated by broad decisions affecting a welfare benefits plan, as opposed to specific decisions directed at individuals. This Court finds that the first argument has merit, and it grants defendants' motion for summary judgment on the § 510 claim.

In *West v. Butler*, 621 F.2d 240 (6th Cir.1980), a pension fund brought a § 510 claim against defendants for their picketing of coal mines, resulting in reduced production or complete closing of the mines. The pension fund contended that defendants violated § 510 because the reduction in mining profits resulted in a reduction of employer contributions to the fund. Before concluding that § 510 was not violated by defendants' conduct, the Sixth Circuit examined the legislative history to determine the purpose of § 510.

The legislative history reveals that the prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights. Senator Hartke, speaking on behalf of his proposal that the Secretary of Labor be directed to establish administrative procedures for enforcing the provision that became § 510, made this clear:

Most collective bargaining agreements protect employees against discharge without good cause and provide effective enforcement machinery in arbitration proceedings whose results are enforceable under section 301 of the Labor-Management Relations Act. But roughly half of all pension participants are not unionized and so they lack protection. Especially vulnerable are managers and executives whose substantial pension potentialities provide an incentive to their discharge be-

---

10. In their reply brief, defendants virtually concede that a finding in favor of the plaintiffs on the § 301 claim will resolve the claims under § 404 and § 406. Defendants' reply brief, at 16.

fore vesting. The managers of the bill ought to think twice too. Discipline and discrimination can be so unpleasant as to amount to constructive discharge, a term used by the National Labor Relations Board. That can be the type of harassment which does not say that one is fired, but makes living such a hell that a person wishes he did not have to hang on and endure.

In recognition of that problem, section 610 of S.4 as originally reported—made it illegal to "discharge, fine, suspend, expell [sic], discipline or discriminate" against plan participants to defeat rights under the act or a plan. The language parallels section 8(a)(3) of the National Labor Relations Act and should do the trick—but only if an adequate enforcement machinery exists.

119 Cong.Rec. 30374, *reprinted in* Legislative History at 1774–75. *See also 119* Cong.Rec. 30044, *reprinted in* Legislative History at 1641 (Senator Javits explained that § 510 would prevent an employer from arbitrarily discharging an employee whose pension rights are about to vest). Thus, it appears Congress designed § 510 primarily to protect the employment relationship that gives rise to an individual's pension rights.

Of course, an individual's employment relationship may be disrupted in a variety of ways. For example, a certified union might expel a member who alleges pension fund improprieties and then demand that he be dismissed under a union-shop agreement. Indeed, the violation may be even more subtle; as Senator Hartke pointed out, discrimination may make an employee's work life so unpleasant as to amount to a constructive discharge. Regardless of its form, however, we conclude that discrimination, to violate § 510, must affect the individual's employment relationship in some substantial way.

*Id.* at 245–246 (footnotes omitted). Based upon this understanding of § 510, the court held that the complaint had not stated a cause of action, because "§ 510 as we read

it does not purport to protect the financial security of pension funds. Rather, the section is aimed solely at protecting individual rights." *Id.* at 246.

The First Circuit has elaborated on the Sixth Circuit's statement that § 510 protects individuals, rather than pension funds. In *Aronson v. Servus Rubber, Division of Chromalloy*, 730 F.2d 12 (1st Cir.1984), *cert. denied*, 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 357 (1984), the employer refused to make contributions to a pension plan for workers in a facility that was "winding down," even though it made such contributions to a plan for employees in a facility that was to remain in business. Because the employer did not make a profit that year, it was not required by the terms of the plan to make such contributions. Workers from the plant that had wound down brought a claim under § 510. The court found that the plaintiffs' claim was "a misreading of a section which relates to discriminatory conduct directed against individuals, not to actions involving the plan in general." *Id.* at 16. It recognized that the broad reading of the word "discriminates" would prohibit any partial termination of a plan—a result inconsistent with ERISA's acceptance of partial terminations. The court continued:

This is not to say that a plan could not be discriminatorily modified, intentionally benefitting, or injuring, certain identified employees or a certain group of employees, but a partial termination cannot constitute discrimination per se. A termination that cuts along independently established lines—here separate divisions—and that has a readily apparent business justification, demonstrates no invidious intent.

*Id.*

■ Plaintiffs claim that defendants arbitrarily created classes of pre-July 11, 1983 retirees and post-July 11, 1983 retirees, discriminating against the latter group. *Aronson* refutes the implied argument that such a distinction constitutes per se discrimination. However, *Aronson's* caveat that a plan could be discriminatorily modified to affect a group of individual

**1304**

employees appears to be implicated in this case. Since defendants were contractually bound to pay health benefits for the individual plaintiffs, there is no "readily apparent business reason" for terminating the benefits to the individual plaintiffs while continuing them for the employees who retired during the labor contract. There are no "independently established divisions" in this case, only the artificial distinction created by the end of the collective bargaining agreement.[11]

There is no indication in the *Aronson* decision, however, that the Sixth Circuit's requirement that an employment relationship must be affected in a substantial way for § 510 to be violated is also the law of the First Circuit. This Court is bound by the Sixth Circuit's requirement that an employment relationship has been affected for the purpose of interfering with a beneficiary's rights. *See Garry v. TRW, Inc.*, 603 F.Supp. 157, 162–63 (N.D. Ohio 1985). Thus, this Court cannot permit plaintiffs to proceed on the cause of action described in *Aronson* unless the Sixth Circuit's requirement is met.[12]

Plaintiffs respond that § 510's requirement that the employment relationship must be affected in a substantial way is met by defendants' alleged misrepresentations to Walter Kosky and others, inducing them to not elect their options to retire before July 11, 1983. By its terms, this argument focuses on plaintiffs' retirement decisions, rather than on an ongoing employment relationship. Since *West* establishes that § 510's purpose is to protect the employment relationship, this argument must fail. Accordingly, defendants' motion for summary judgment on the § 510 claims is granted, and those claims are dismissed.

## VI. THE PENDENT STATE CLAIMS

### A. *Promissory Estoppel*

Defendants challenge plaintiffs' state law claims by arguing that they are dis-

placed by the broad preemptive effect of ERISA. Section 514(a) of ERISA, 29 U.S.C. § 1144(a) (1982) provides in pertinent part that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefits plan...." Thus, state claims are preempted if they "ha[ve] a connection with reference to [a benefit plan]." *Shaw v. Delta Airlines*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983). The company cites a number of cases holding that claims of promissory estoppel and intentional infliction of emotional distress are preempted by ERISA.

Plaintiffs recognize that their state claims are arguably preempted by § 301 as well as by ERISA. They point out that while the Sixth Circuit had declined to decide whether state claims were preempted by § 301 in similar actions, it had pointed to authority suggesting that parallel state claims could exist. *Weimer*, 733 F.2d at 676–77 n. 7. *See also Policy*, 770 F.2d at 616–17 (refusing to decide applicability of plaintiffs' estoppel arguments). However, plaintiffs have properly noted in a supplemental brief that the issue of whether the promissory estoppel claims are preempted by § 301 is resolved in *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210 (6th Cir.1987). In that case, plaintiffs sought to receive early retirement benefits described in the defendant's pension plan. In an earlier decision, the Sixth Circuit had reversed the district court's entry of summary judgment for the defendant on a claim of breach of contract, finding triable issues of fact under the doctrines of estoppel and waiver. *Apponi v. Sunshine Biscuits, Inc.*, 652 F.2d 643, 649–50 (6th Cir.1981). On appeal from a jury verdict against it, defendant argued that plaintiffs' action had been preempted by § 301. The court noted

---

**11.** *Cf. Aronson*, 730 F.2d at 16, where the court found that the employer's chosing to pay contributions for employees in the facility continuing to operate was motivated by a desire to support morale for its ongoing operations.

**12.** The plaintiffs in *Aronson* were still employed by defendants at the time the § 510 violation allegedly occurred, even though their jobs would soon be terminated by the closing of their facility. Therefore, *Aronson* is also factually distinguishable from the case before this Court.

that § 301 had recently been accorded a broad preemptive effect by the Supreme Court in *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). It concluded that plaintiffs' claims arose from the pension plan established through collective bargaining, and it held that *Allis-Chalmers* required that plaintiffs' claims be treated as § 301 claims. *Apponi,* 809 F.2d at 1215–16. *Apponi* clearly controls this Court, which must dismiss plaintiffs' pendent promissory estoppel claims and treat those claims as part of the § 301 cause of action.

Since this Court must dismiss the state law promissory estoppel claims of the plaintiffs as preempted, defendants' motion for partial summary judgment, which argues that some plaintiffs have not adduced evidence supporting promissory estoppel, is moot. Nevertheless, this motion and the responsive briefs will be discussed, since they bear upon whether all plaintiffs will be entitled to assert § 301 promissory estoppel claims when trial on the life insurance issues proceeds.

Defendants argue that twenty-four individual plaintiffs are not entitled to go forward on claims of promissory estoppel. These plaintiffs are divided into four groups: (1) thirteen plaintiffs whose interrogatory answers indicate that no representations had been made to them by any Park-Ohio employee regarding retiree benefits; (2) four plaintiffs who had no knowledge of, or no recollection of, such representations; (3) four plaintiffs who received such representations after having retired; and (4) three plaintiffs failing entirely to respond to defendants' discovery requests. Defendants argue that these plaintiffs have failed to meet their burden to establish the elements of promissory estoppel.

Plaintiffs do not dispute that the twenty-four plaintiffs singled out by defendants answered their interrogatories as represented by defendants, nor do they adduce additional evidence casting a different light on those answers. Instead, they respond primarily by arguing that misrepresentations to union agents call for broad remedies, including denial of defendants' mo-

tion. They point to the evidence that Ostromek and Kaczmarczyk had met with Kirkhoff to discuss employees' concerns that they should retire before expiration of the 1980–83 labor contract in order to assure their receipt of retirement insurance benefits and that Kirkhoff informed them that "there was nothing to worry about." Based on this alleged misrepresentation, Ostromek posted a notice in the union hall describing Kirkhoff's assurances, and Kaczmarczyk told his constituents that their benefits would not be cut. Plaintiffs assert that Kirkhoff knew that he was addressing union agents "for general dissemination," and that there was a likely "grapevine effect" in which the misrepresentation of Kirkhoff was relayed to all individual plaintiffs. In addition, plaintiffs point to evidence that some individual plaintiffs, not targets of the partial summary judgment motion, were told by other individual plaintiffs of alleged misrepresentations. In essence, plaintiffs argue that the widespread discussion of the misrepresentation should preclude summary judgment, despite the failure of many plaintiffs to indicate in their interrogatory answers that they received preretirement knowledge of a misrepresentation.

This Court agrees that defendants' motion for partial summary judgment against the four groups of individual plaintiffs must be denied because of the alleged statements to the union representatives. The Sixth Circuit has set forth the elements of promissory estoppel claims under § 301, declaring them to be defined by federal common law:

(1) conduct or language amounting to a representation of material facts; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on or act such that the party asserting the estoppel has a right to believe it so intended; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must detrimentally and justifiably rely on the representation.

*Apponi,* 809 F.2d at 1217 (citations omitted). These elements do not indicate that the misrepresentation must be made or communicated to the party seeking to assert estoppel. The question, then, is whether a requirement that the plaintiff knew of the misrepresentation must be read into the "reliance" element. This Court believes that an individual plaintiff could rely upon a misrepresentation without knowing that the misrepresentation had been made. Individual plaintiffs might testify that they chose to not retire before the labor contract's expiration because the union did not inform them that their retiree insurance was not assured. The union, through Ostromek, indicates that it was satisfied that post-contract retirees' benefits were not in jeopardy. It may not have taken steps to alert those eligible for retirement of their potential predicament, steps which would have otherwise been taken if not for the alleged misrepresentations. Therefore, if individual plaintiffs relied upon the union's not informing them of the possibility that they could lose their benefits, even though they were unaware of Ostromek's notice indicating that the benefits would not be discontinued, they could still establish all elements of estoppel.

Other decisions support this Court's decision that summary judgment is not proper against the twenty-four individual plaintiffs. In *Bower v. Bunker Hill Co.,* 725 F.2d 1221, 1224 (9th Cir.1984), one of two employees allegedly receiving a management representation bearing on whether the parties had contracted for lifetime benefits was the union president. The court vacated the district court's order for summary judgment for the defendant, stating in part:

> While representations to two of the 2400 workers employed by Bunker Hill may not constitute a material issue, when one of those two workers is the local union president, the representations become more troubling. An influential labor figure may bargain on behalf of others, or widely circulate misinformation. Under these circumstances, a more detailed inquiry into the effect of management representations is required.

Although this issue may ultimately prove immaterial, the record is not yet sufficiently developed to make this determination.

*Id.* The union president's proclivity for "widely circulat[ing the] misinformation" is not at issue here, for individual plaintiffs were required to indicate such a communication in their answers to interrogatories. Instead, this Court endorses the Ninth Circuit's recognition that union leaders may take action, or fail to take action, on behalf of their members. This Court concludes that a misrepresentation to Ostromek could have farreaching results, even though not communicated to all affected retirees.

In addition, another court in this Circuit has found that misrepresentations can be spread by means other than direct communication. In *International Union v. Cadillac Malleable Iron Co., Inc.,* No. G82–75 CA1 (W.D.Mich. March 30, 1983), *aff'd,* 728 F.2d 807 (6th Cir.1984), the district court had included several employees who had retired after a collective bargaining agreement expired and during a strike within its order that plaintiffs were entitled to lifetime retiree health insurance created by the labor contract. The defendant sought to alter the conclusions of law and the judgment to exclude the post-contract retirees. One of these retirees, Mr. Stiver, had been assured by the company's agent on employment retirement benefits, Mrs. Brehm, that he could retire during a strike several months before the strike began. Mr. Stiver did not retire until the strike began. The court continued:

> Though this Court does not have any information before it which indicates whether other Cadillac Malleable employees who retired during the strike also previously discussed retirement with Mrs. Brehm, it is not unreasonable to assume, even absent such conversations, that similarly situated employees were somehow made aware of the course followed by Mr. Stiver and, based on his apparent success, also decided to retire after the 1981 strike began. Accordingly, this Court finds that Cadillac Malleable employees who had fulfilled all the

requirements for retirement prior to the October 1, 1981 commencement of the strike and who maintained their employee status up until that date, but retired during the pendency of the strike, are entitled to the payment of their retirement benefits by Cadillac Malleable. Slip op. at 4. This opinion recognizes that justifiable and detrimental reliance on a misrepresentation can be mimicked without actual knowledge of the misrepresentation.

Defendants have propounded extensive interrogatories to seek information about what statements have been conveyed to the individual plaintiffs. Their error is in failing to realize that the federal common law elements of estoppel can be established without actual knowledge of the alleged misrepresentation. Accordingly, the individual plaintiffs will be entitled to establish § 301 claims for life insurance benefits by use of a promissory estoppel theory.

B. *Intentional or Negligent Infliction of Emotional Distress*

Plaintiffs' fourth cause of action—that defendants' termination of retiree insurance benefits for the alleged purpose of obtaining leverage in the strike with the union was a negligent or intentional infliction of severe emotional distress—must also be analyzed under § 301's preemptive scope. In *Allis-Chalmers*, the Court indicates that § 301's preemptive effect must extend beyond actions alleging contract violations if the policies animating § 301 are to be given full effect. 471 U.S. at 210, 105 S.Ct. at 1910. Otherwise, plaintiffs hoping to avoid § 301 could simply accomplish that end by the creative pleading of essentially contractual claims as torts. *Id.* at 211, 105 S.Ct. at 1911. As a result, the Court held, "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Id.* at 220, 105 S.Ct. at 1916 (citation omitted). The preemptive effect of § 301 on state law claims somewhat related to a collective bargaining agree-

ment or its participants is to be determined on a case-by-case basis. *Id.*

Since the issuance of the *Allis-Chalmers* decision, several courts have decided that emotional distress claims are preempted by § 301. In *Truex v. Garrett Freightlines, Inc.*, 784 F.2d 1347 (9th Cir.1985), plaintiffs premised their emotional distress action on claims that their employer issued unwarranted warning letters, engaged in excessive supervision of them, and altered their work assignments. The court recognized that these claims were essentially allegations that plaintiffs had been improperly treated under the terms of the collective bargaining agreements. Citing *Allis-Chalmers*, the court stated, "Because an evaluation of these claims is substantially dependent upon analysis of the terms of the collective bargaining agreements, the claims are preempted by federal labor law." *Id.* at 1350.

The Ninth Circuit noted that an exception to federal preemption for some emotional distress claims had been set forth in *Farmer v. United Brotherhood of Carpenters & Joiners of America*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). A two-pronged test for permitting a state tort action was established: "Simply stated, it is essential that the state tort be either unrelated to employment discrimination or a function of particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself." 430 U.S. at 305 (footnote omitted). The Ninth Circuit construed the prong excluding torts "unrelated to employment discrimination" as equivalent to a requirement that the actions behind the tort not be "inextricably intertwined" with a standard created by the collective bargaining agreement. *Truex*, 784 F.2d at 1351 (citing *Bloom v. International Brotherhood of Teamsters, Local 468*, 752 F.2d 1312, 1314 (9th Cir.1984)). The court also construed the "particularly abusive manner" prong of the *Farmer* exception narrowly. It contrasted "the mere breaking of a promise" with a case in which the employee faced derogatory signs, jeering, nuts and bolts thrown at him, intentional

cigarette burns, vandalism and vulgar remarks about his wife. *Truex,* 784 F.2d at 1351. The court held that plaintiffs before it did not meet either prong of the *Farmer* exception, and it affirmed the district court's finding that plaintiffs' emotional distress claims were preempted by § 301. *Id.* at 1351–52.

Under the analysis set forth in *Truex,* this Court must hold that plaintiffs' emotional distress claims are preempted by § 301. First, it is indisputable that the terms of the collective bargaining agreement must be construed and plaintiffs' interpretation must be accepted before plaintiffs can establish their emotional distress claim. Obviously, defendants could not be held liable for plaintiffs' anxiety over the termination of retiree insurance benefits if defendants owed no such benefits in the first place. Plaintiffs' emotional distress claims can only be saved, then, if they can demonstrate the applicability of a prong of the *Farmer* exception. They cannot show that the state tort is not "inextricably intertwined" with a term of the collective bargaining agreement, for the reason just discussed. They also cannot show more than a "mere breach of contract," since their complaint does not allege any of the extreme circumstances deemed sufficient by the *Truex* court. Even though the individual plaintiffs allege that defendants terminated their benefits for leverage in the collective bargaining process, that reason will not raise defendants' action to the level of "particularly abusive." Every breach of contract apparently has some reason behind it, yet *Truex* held that a mere breach is insufficient to satisfy *Farmer's* second prong. Accordingly, this Court holds that plaintiffs' fourth cause of action is preempted by § 301 and must be dismissed. *See also Peoples v. Pennsylvania Power & Light Co.,* 638 F.Supp. 402, 407–08 (M.D. Pa.1985); *Hohn v. Kaiser Cement Corp.,* 624 F.Supp. 549, 550–51 (D.Mont.1986). This holding does not resolve the question of whether plaintiffs will be able to prove their entitlement to damages for emotional distress under their ERISA claims; this issue will be discussed below.

## VII. PUNITIVE AND EMOTIONAL DISTRESS DAMAGES UNDER ERISA

In addition to their motions for summary disposition of this case, defendants move to dismiss plaintiffs' prayers for emotional distress and punitive damages as remedies for the ERISA and promissory estoppel claims. This motion is moot with respect to the state promissory estoppel claims, since this court has dismissed those claims as preempted under § 301. Defendants rely upon *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), and its progeny for support for their argument that extracontractual and punitive damages are not available under ERISA. Plaintiffs respond by citing this Court's decision in *Haytcher v. ABS Industries, Inc.,* No. C85–3181 (N.D. Ohio June 9, 1986), *amended* (N.D. Ohio June 30, 1986), in which this Court held that extracontractual and punitive damages could be recovered under §§ 502(a)(1)(B) and 502(a)(3) of ERISA. Because of precedential developments during the period since *Haytcher* was decided, this Court repudiates its ruling on the damages issue in that case and dismisses the prayers for emotional distress and punitive damages in the second cause of action.

Civil actions under ERISA which are brought by participants or beneficiaries find their jurisdiction under one of the first three subsections of § 502 of ERISA:

A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate

equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plans. . . .

29 U.S.C. §§ 1132(a)(1)–(3) (1982). Section 409 of ERISA, 29 U.S.C. § 1109 (1982) ("§ 409"), which is enforced under § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) (1982) ("§ 502(a)(2)"), permits plaintiffs to seek personal liability from fiduciaries who have breached their fiduciary duties under ERISA. Plaintiffs do not seek personal liability under § 409. They do allege violations of § 404 and § 406 of ERISA pursuant to § 502(a)(3), and they desire to enforce rights under the insurance plans and recover benefits allegedly due to them pursuant to § 502(a)(1). Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Plaintiffs' Request for Punitive and Emotional Distress Damages, at 1–2.

In *Russell*, the Supreme Court held that Congress did not provide for extracontractual damages to be paid to beneficiaries successfully prosecuting a § 409 claim for breach of fiduciary duty under ERISA. 105 S.Ct. at 3094.[13] The Court also established that recovery for § 409 violations must be disbursed to the plan, rather than to individual beneficiaries. *Id.* at 3089. Despite the Court's pronouncement that "[t]he six carefully-integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly," *id.* at 3093, the Court specifically noted that *Russell* does not decide whether extracontractual damages are available under ERISA civil enforcement provisions other than § 502(a)(2). *Id.* at 3089 n. 5.

In *Haytcher*, this Court concluded that *Russell* did not control the issue of whether emotional distress and punitive damages are available as remedies for claims under §§ 502(a)(1) and 502(a)(3). Slip op. at 8–9. It refused to strike the claims for such damages, relying upon other authority in

the Sixth Circuit, *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Federal Forge, Inc.*, 583 F.Supp. 1350 (W.D.Mich.1984). *Haytcher*, slip op. at 9–10.

Since the *Haytcher* decision was rendered, many courts have held that the *Russell* decision requires that extracontractual and punitive damages are precluded in actions pursuant to § 502(a)(3), despite *Russell*'s explicit refusal to afford its opinion such an expansive scope. *Sokol v. Bernstein*, 803 F.2d 532 (9th Cir.1986), is the decision that most thoroughly discusses the rationale for this holding. Although recognizing that *Russell* was not dispositive of the issue before it, the court stated, "[A] textual exegisis of the *Russell* opinion, combined with careful examination of the statute's structure and legislative history, compels the conclusion that damages for emotional distress are unavailable under § 502(a)(3) as well as under § 409." *Id.* at 534.

First, the *Sokol* court identified three bases for the result in *Russell* and decided that these principles were equally applicable to § 502(a)(3), particularly since both that provision and § 502(a)(2) authorized the catch-all remedy of "other appropriate equitable relief." These three considerations were: (1) *Russell* implied that ERISA's fiduciary duties run to the plan, rather than to the participants or beneficiaries, and thus individualized damages such as those for emotional distress were not contemplated by the statute; (2) the statute has a "glaring omission" of any mention of extracontractual damages; and (3) the six "carefully-integrated civil enforcement provisions" of § 502(a) should dissuade courts from reading into the statute remedies not explicitly provided. 803 F.2d at 535–36. The court went on to state that even if *Russell*'s rationale were not applicable to its decision, the legislative history of ERISA would compel the same result. It concluded that the legislative history indicated that the statute was

---

**13.** Although the holding as stated by the Court mentioned only extracontractual damages, the result of the case clearly reached punitive damages under § 409 as well. *See* 105 S.Ct. at 3087.

aimed at protecting the integrity of employee benefit plans, rather than individual participants and beneficiaries. *Id.* at 537. Finally, the court determined that the word "equitable" in § 502(a)(3) assumed its usual meaning—injunctive or declaratory relief. *Id.* at 538. Accordingly, the court ordered that damages for emotional distress which had been awarded to the beneficiary must be remitted. *Id.*

The other courts of appeal facing the issue of whether § 502(a)(3) permits extracontractual or punitive damages since *Russell* have reached the same decision as the *Sokol* court. *Kleinhaus v. Lisle Savings Profit Sharing Trust,* 810 F.2d 618, 627 (7th Cir.1987) (punitive damages); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1463–64 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987) (punitive damages); *Powell v. Chesapeake & Potomac Telephone Co. of Virginia,* 780 F.2d 419, 424 (4th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986) (extracontractual and punitive damages).

While fewer cases discuss the effect of *Russell* on § 502(a)(1), it is obvious that all arguments found persuasive in *Sokol,* except the argument relying on the "other appropriate equitable relief" language, are equally applicable to § 502(a)(1). Indeed, some courts have pronounced that extracontractual or punitive damages are *never* available as ERISA remedies. *Coleman v. General Electric Co.,* 643 F.Supp. 1229, 1236 (E.D.Tenn.1986) (extracontractual damages); *Boesl v. Suburban Trust & Savings Bank,* 642 F.Supp. 1503, 1515–16 (N.D.Ill.1986) (punitive damages); *Trogner v. New York Life Insurance Co.,* 633 F.Supp. 503, 501 (D.Md.1986) (punitive damages).

This Court is concerned that the lower courts may be hasty in applying *Russell's* holding to other § 502(a) provisions, particularly since the analysis of many courts has not been as exacting as that in *Sokol.* Moreover, a reasonable argument can be made that extracontractual damages are available under other § 502(a) subsections.

*See* Note, *Participant and Beneficiary Remedies Under ERISA: Extracontractual and Punitive Damages After Massachusetts Mutual Life Insurance v. Russell,* 71 Cornell L.Rev. 1014 (1986). Given the overwhelming weight of precedent since *Russell* for precluding extracontractual and punitive damages in ERISA actions, however, this Court believes that it must retreat from its holding in *Haytcher* and dismiss plaintiffs' prayer for emotional distress and punitive damages in the second cause of action.

## VIII. JURY DEMAND

█ Finally, defendants move to strike the jury demand with respect to the ERISA claims. In *Haytcher,* this Court refused to strike the jury demand for a § 502(a)(1) claim arising under similar facts. It noted that *Crews v. Central States,* 788 F.2d 332, 338 (6th Cir.1986), required that it determine whether the ERISA cause of action was legal or equitable in nature before concluding whether the claim could properly be heard by a jury. Slip op. at 4–5. Relying upon *Bugher v. Feightner,* 722 F.2d 1356 (7th Cir.1983), *cert. denied,* 469 U.S. 822, 105 S.Ct. 98, 83 L.Ed.2d 43 (1984), and *Bower v. Bunker Hill Company,* 114 F.R.D. 587 (E.D.Wash.1986), the Court concluded that plaintiffs' claim under § 502(a)(1) would be tried to a jury. Slip op. at 5–7.

Upon reconsideration, this Court is not persuaded that its reasoning in *Haytcher* is incorrect. Moreover, it is convinced that *Bugher's* rationale requires that the § 502(a)(3) claims also be tried to a jury. Therefore, the company's motion to strike the jury demand is denied, and the ERISA claims which have not been disposed of by summary judgment will be tried to a jury.

## IX. CONCLUSIONS

In summary, the Court has made the following rulings for the reasons stated above:

(1) Summary judgment is entered for plaintiffs on their § 301 claims for health insurance benefits. Summary judgment is denied for plaintiffs on their § 301 claims for life insurance benefits. Defendants' summary judgment motion on the § 301

claims is denied. Accordingly, trial will proceed on the § 301 claims for life insurance benefits. All plaintiffs will be entitled to proceed on a promissory estoppel theory under that § 301 claim.

(2) Summary judgment is entered for plaintiffs on their claims under § 404 and § 406 of ERISA with respect to the health insurance benefits. Summary judgment is denied to plaintiffs on their § 404 and § 406 claims with respect to life insurance benefits, since plaintiffs must prevail upon their § 301 claims before their § 404 and § 406 claims on the life insurance plan can be examined. Defendants' motion for summary judgment on these claims is denied.

(3) Summary judgment is entered for defendants on the claims under § 510 of ERISA.

(4) Defendants' motion to dismiss plaintiffs' third and fourth causes of action of the amended complaint is granted, as these claims are preempted by § 301.

(5) Defendants' motion for partial summary judgment is denied as moot.

(6) Defendants' motion to dismiss plaintiffs' request for punitive and emotional distress damages for the second cause of action, the ERISA claims, is granted.

(7) Defendants' motion to strike plaintiffs' jury demand is denied.

IT IS SO ORDERED.